Submitted January 30, reversed and remanded July 1, 2009

**STATE OF OREGON,**
*Plaintiff-Respondent,*

*v.*

**DOUGLAS CARL MOORE,**
aka Dc Moore,
aka Douglas Earl Moore,
*Defendant-Appellant.*

Umatilla County Circuit Court
CF050356; A134343

211 P3d 344

Peter Gartlan, Chief Defender, and Susan F. Drake, Senior Deputy Public Defender, Office of Public Defense Services, filed the brief for appellant.

Hardy Myers, Attorney General, Mary H. Williams, Solicitor General, and Matthew J. Lysne, Assistant Attorney General, filed the brief for respondent.

Before Armstrong, Presiding Judge, and Brewer, Chief Judge, and Carson, Senior Judge.

BREWER, C. J.

## BREWER, C. J.

Defendant, who was convicted of felon in possession of a firearm, ORS 166.270, appeals his conviction, arguing that the trial court erred in denying his motion to suppress evidence obtained in violation of his state and federal constitutional rights. In particular, defendant asserts that the trial court should have suppressed evidence of statements that he made while in compelling circumstances, because he had not been advised of his *Miranda* rights. As explained below, we agree with defendant that his rights under Article I, section 12, of the Oregon Constitution were violated. We therefore reverse and remand.

On appeal of a denial of a motion to suppress evidence, we review for errors of law. We are bound by the trial court's findings of fact if the evidence in the record supports those findings. *State v. Ehly*, 317 Or 66, 75, 854 P2d 421 (1993). Most of the facts are not disputed and, to the extent that one fact was disputed, it was resolved by the trial court's explicit finding that Trooper Chichester's testimony was credible. We therefore recount the facts as shown by the undisputed evidence and the trial court's finding.

Chichester stopped defendant's truck after observing that defendant, the driver, was not wearing a seatbelt. Chichester activated the overhead lights of his patrol car—a canine unit that had his dog in a portion of the back seat—and defendant pulled over. Chichester explained his reason for stopping defendant and asked for defendant's license, registration, and proof of insurance, all of which defendant provided. Chichester observed ammunition on the dashboard and asked defendant if there were any firearms in the truck. Defendant responded that there was a rifle. Chichester asked defendant for the rifle, which defendant retrieved from behind the front seat. Defendant also showed Chichester a piece of a disassembled rifle that he had in the truck. Chichester then took the rifle to the police car. By that point, a back-up officer had arrived on the scene.

When Chichester checked defendant's criminal history and driving status, he discovered that defendant had a felony conviction. Chichester then handcuffed defendant, placed him in the back of his patrol car, and locked him in. He

explained to defendant that he was being detained, but that he was not under arrest. Chichester explained at the suppression hearing that, by "not under arrest," he meant that he did not intend to take defendant to jail, but intended to cite and release him.[1] Shortly after placing defendant in the back seat of the patrol car, Chichester returned to the patrol car, opened the rear door, and questioned defendant about the rifle. Chichester stood in the doorway to the patrol car, and defendant would not have been able to leave the patrol car at that time. Defendant then made incriminating statements that are the subject of the motion to suppress.

In his suppression motion, defendant argued that he either was under arrest or was in compelling circumstances at the time that he made the statements and therefore should have been advised of his *Miranda* rights before being questioned. The trial court denied the motion, specifically relying on its finding that, before the statements were made, Chichester had told defendant that defendant was not under arrest. At trial, defendant's theory of the case was that he did not know that the rifle had been left in the truck, that his answer to Chichester's initial question about firearms was a reference to the piece of disassembled rifle that defendant knew to be in the truck, and that he did not know of the functional rifle until he turned to retrieve the rifle piece. In closing argument, the prosecutor asserted that defendant's theory of the case was undermined by statements that defendant had made to Chichester when he was handcuffed in the police car, indicating that defendant knew of the rifle's presence.

On appeal, defendant reiterates his argument that, under the circumstances, *Miranda* warnings were required before Chichester questioned him about the rifle. The state responds that, because Chichester was polite and professional throughout the encounter and because defendant was told that he was not under arrest before the questioning began, *Miranda* warnings were not required. Alternatively, the state argues that, even if the statements should have been suppressed, any error was harmless. As explained

---

[1] Defendant denied that he was told that he was not under arrest, but the trial court specifically found Chichester to be credible on that point.

below, we conclude that the circumstances were compelling and, accordingly, that *Miranda* warnings should have been given before defendant was questioned while he was handcuffed and detained in the back of the patrol car. We also disagree with the state that the error was harmless beyond a reasonable doubt.

Although *Miranda* warnings originated from the United States Supreme Court's decision in *Miranda v. Arizona*, 384 US 436, 86 S Ct 1602, 16 L Ed 2d 694 (1966), they also are required by Article I, section 12, of the Oregon Constitution, which provides that "[n]o person shall be * * * compelled in any criminal prosecution to testify against himself." Under Article I, section 12, not only must *Miranda* warnings be given to a person who is in "full custody," but they also must be given under circumstances that "create a setting which judges would and officers should recognize to be compelling." *State v. Roble-Baker*, 340 Or 631, 638, 136 P3d 22 (2006) (internal quotation marks omitted).

We begin by reiterating the core principle stated by the Court in *Miranda*:

"[T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way."

*Miranda*, 384 US at 444. In *Roble-Baker*, the court stated, "[I]n determining whether the police placed a defendant in compelling circumstances, this court will consider all the circumstances, and its overarching inquiry is whether the officers created the sort of police-dominated atmosphere that *Miranda* warnings were intended to counteract." 340 Or at 641.

Thus, the focus of our inquiry is whether defendant was deprived of his freedom of action in any significant way while in a police-dominated atmosphere. The court in *Roble-Baker* summarized four key factors that should be considered in making that inquiry: (1) the location of the encounter,

(2) the length of the encounter, (3) the amount of pressure exerted on the defendant, and (4) the defendant's ability to terminate the encounter. *Id.* at 640-41. Here, two of those four factors weigh strongly in favor of a finding that defendant was deprived of his freedom of action in a significant way, while in a police dominated atmosphere, when he made the statements at issue. The first is location: Defendant was in the back of a patrol car, in handcuffs, while the officer questioning him stood in the doorway of the patrol car.[2] We have no difficulty in concluding that the back of a patrol car from which a person is unable to exit constitutes a police-dominated location. The fourth factor cited by the court in *Roble-Baker* also weighs in defendant's favor here. Nothing in the record suggests that, while Chichester was questioning defendant when defendant was handcuffed in the back of the patrol car, he had the ability to terminate the encounter *at that point in time.* That is, while the questioning was occurring, defendant was not free to leave. *Accord State v. Werowinski,* 179 Or App 522, 530-53, 40 P3d 545, *rev den,* 334 Or 632 (2002) ("compelling circumstances" existed where the defendant was questioned while officer blocked his egress from the back of a patrol car); *see also State v. Satchell,* 209 Or App 809, 150 P3d 4 (2006) (defendant who was handcuffed and confronted with evidence against him was in compelling circumstances).

The state argues that the two remaining factors militate in favor of a finding that the circumstances here were not compelling. That is, the state suggests that, although Chichester detained defendant while the questioning occurred, the circumstances were not compelling because Chichester did not intend to detain defendant for a long period of time—he intended to (and ultimately did) cite and release defendant rather than transporting him to jail—and Chichester did not exert undue pressure during the questioning.

---

[2] We note that the presence of a police dog in the same location could, in some circumstances, have bearing on the inquiry as well. Here, all the evidence indicated that the dog, who was in a separate compartment from defendant, was friendly. Moreover, defendant testified that he was not intimidated by the dog's presence.

We disagree that that circumstance weighs in favor of the state's position that the circumstances were not compelling. As the court made clear in *Roble-Baker*, the fact that the detained person is led to believe he or she might be released soon after questioning can, in fact, weigh *in favor* of a finding of compelling circumstances. In *Roble-Baker*, the defendant, a murder suspect, voluntarily accompanied officers to police headquarters to be interviewed. The questioning was "relaxed," and the defendant was told that detectives would drive her back to work after the interview. 340 Or at 634. The detectives convinced the defendant to meet with a polygraph examiner. The defendant told the polygraph examiner that she would take a polygraph the following day. He told her that "she'd always been free to leave," and then said he would check with the detectives to see if they had any more questions for her. *Id.* at 635. The detectives told the defendant that her grade-school-age son was being questioned and that he would be brought to the police station. They then recommenced questioning the defendant:

"Although there were long periods during which defendant did not respond to [Detective] Newell, she told him that she would make a statement after speaking with her son. She said, 'I don't have any friends to talk to and I don't know any attorneys. I just want to spend some time with [my son].'

"Because defendant was emotional, Newell was concerned that she would harm herself or her son. He told her, 'I'm afraid that you will hurt yourself and you could hurt yourself or your son both because of this whole thing coming to light.' Defendant did not respond. He then suggested what he described as 'a compromise,' stating to defendant, 'Why don't we end this nightmare now, and then you can talk to your son * * *.' Newell testified that the conversation was 'taking place over some time' because 'she was smoking cigarettes and she was pretty emotional.' He stated that '[t]here was times when she would just be quiet, she wouldn't say anything.' Eventually, Newell faced defendant and asked her, 'Did he deserve that?' She responded 'no,' explaining that '[w]e had some bad times, but he was a good man.' At some time between 3:00 p.m. and 4:00 p.m., approximately five to six hours after the detectives began questioning her, defendant said, 'I hope I'm doing the right thing,' and then she confessed to killing her husband, claiming she had done so in self-defense.

> "Newell ended the interview, and Wright told defendant that her son was at police headquarters."

*Id.* at 636-37 (brackets in original; some internal quotation marks omitted). The court rejected the state's argument that those circumstances were not compelling:

> "Assuming that, with greater persistence, defendant could have terminated the interview and secured a ride back to work, she could have done so only if she decided not to wait for her son. As a practical matter, defendant could not leave until her son arrived. By failing to terminate the interview upon defendant's request and by creating a situation that required defendant to remain at police headquarters, the detectives undermined their earlier representation that she was 'free to leave.' "

*Id.* at 642.

The present case has some similarities. Although the detention in this case was much shorter, there is a key feature that is the same: At the time the questioning was occurring, neither defendant here nor the defendant in *Roble-Baker* was, *at that point in time*, free to end the encounter. In *Roble-Baker*, the defendant was dependent on the police for transportation and also needed to remain in order to be reunited with her child and thus was not free to leave during the questioning although she was led to believe that she would be free to leave in a short time. Here, even more clearly, defendant was not free to leave while he was handcuffed and in the back of the police car while he was being questioned. Although he had been led to believe that he would be cited and released, he had *not* been led to believe that he would be cited and released without first being questioned.

In sum, the only factor that may weigh against a finding of compelling circumstances is that the detention in this case was relatively short. We find that that circumstance, however, does not outweigh the other factors discussed above. We conclude that defendant, who was questioned while handcuffed and detained in the back of a patrol car, was in compelling circumstances. The trial court erred in concluding otherwise.

The state argues that defendant's conviction should nonetheless be affirmed because the error in admitting the disputed evidence was harmless. Relying on *State v. McGinnis*, 335 Or 243, 64 P3d 1123 (2003), the state argues that because in this case, defendant testified in support of his theory of the case, the error is necessarily harmless. We conclude that the state has misunderstood a fundamental aspect of *McGinnis*. The question to be answered under *McGinnis* is not simply whether defendant would have testified had the evidence not been erroneously admitted. Rather, as explained below, *McGinnis* requires us to look at the nature of the illegally obtained evidence. Under *McGinnis*, if there was a constitutional violation involving a defendant's un-*Mirandized* statements, the defendant's testimony at trial in response to those statements is not considered in determining whether the admission of the statements was harmless error.

In *McGinnis*, which did not involve a constitutional violation but a statutory one, the court discussed at length—and ultimately adopted—the rule from *Harrison v. United States*, 392 US 219, 88 S Ct 2008, 20 L Ed 2d 1047 (1968), as further clarified in *Oregon v. Elstad*, 470 US 298, 105 S Ct 1285, 84 L Ed 2d 222 (1985). The rule from *Harrison*, as described by the court in *McGinnis*, is that, if a defendant testified after giving an illegally obtained confession, the testimony would be suppressed as fruit of the poisonous tree. *McGinnis*, 335 Or at 251. The court in *McGinnis* went on to explain, however, how that rule had been qualified in *Elstad*:

"In *Elstad*, the defendant argued that statements that the police had obtained in violation of the requirements of *Miranda v. Arizona*, 384 US 436, 86 S Ct 1602, 16 L Ed 2d 694 (1966), 'tainted' the statements that he had made after he had been fully advised of, and had waived, his *Miranda* rights. The Court rejected the defendant's argument that the rule of *Harrison* required the suppression of the statements that he had made after the appropriate *Miranda* waiver. It explained:

" 'This Court has never embraced the theory that a defendant's ignorance of the full consequences of his decisions vitiates their voluntariness. If the prosecution has actually violated the defendant's Fifth Amendment

rights by introducing an inadmissible confession at trial, compelling the defendant to testify in rebuttal, the rule announced in *Harrison v. United States* precludes the use of that testimony on retrial. * * * But the Court has refused to find that a defendant who confesses, after being falsely told that his codefendant has turned State's evidence, does so involuntarily. * * * The Court has also rejected the argument that a defendant's ignorance that a prior coerced confession could not be admitted in evidence compromised the voluntariness of his guilty plea. Likewise, in *California v. Beheler*[, 463 US 1121, 103 S Ct 3517, 77 L Ed 2d 1275 (1983)], the Court declined to accept defendant's contention that, because he was unaware of the potential adverse consequences of statements he made to the police, his participation in the interview was involuntary. Thus we have not held that the *sine qua non* for a knowing and voluntary waiver of the right to remain silent is a full and complete appreciation of all the consequences flowing from the nature and quality of the evidence in the case.'

"470 US at 316-17 (citations omitted). Thus, *Elstad* makes clear that the rule of *Harrison* is limited to those circumstances in which a defendant is compelled to testify at trial as a result of the Fifth Amendment violation that occurs when an illegally obtained confession is used against that defendant at trial. Stated otherwise, a defendant cannot invoke the protection of the *Harrison* rule unless the evidence that the defendant sought to rebut by taking the stand was an inadmissible *confession*, not evidence of some other kind, even if that evidence was obtained illegally."

*McGinnis*, 335 Or at 252-53 (emphasis and ellipses in original). The court then stated, "That said, the United States Supreme Court's rule in *Harrison* does not preclude this court from fashioning a different rule under Oregon constitutional or statutory law. However, we are persuaded by the logic of that Court's rule." *Id*. at 253.

Thus, in *McGinnis*, the court concluded that, when the admission of statements violated a statute, but the statements were "not compelled in any way" such as to implicate a constitutional concern,[3] there was "no reason to exclude

---

[3] We have noted that it is unclear whether the exception adopted by the court in *McGinnis* might apply to constitutional violations other than those involving the

defendant's testimony from a review of the record for harmless error." *Id.* at 254. We have followed that rule of law as set forth in *McGinnis* in a number of cases. *See, e.g., State v. Saunders*, 221 Or App 116, 121, 188 P3d 449, *rev den*, 345 Or 416 (2008) (where the defendant's statements were *not* made under compelling circumstances, any error in admitting that evidence was harmless in light of the defendant's own trial testimony); *State v. Matheson*, 220 Or App 397, 405, 186 P3d 309 (2008) ("Erroneously admitted evidence is harmless if the defendant testifies about the same facts, even if the defendant's testimony is in response to the erroneously admitted evidence, *as long as the erroneously admitted evidence is not an unlawfully compelled confession by the defendant*—which, in this case, it is not." (Emphasis added.)); *State v. Snyder*, 187 Or App 648, 656, 69 P3d 802 (2003), *rev'd in part on other grounds*, 337 Or 410, 97 P3d 1181 (2004) (admission of evidence in violation of a statute "was not the equivalent of an illegally obtained confession" and "therefore did not vitiate the voluntariness of defendant's subsequent testimony at trial" and, accordingly, the erroneous admission of the evidence was harmless).

Although our cases have explicitly acknowledged that the general rule from *McGinnis* that a defendant's testimony may be considered as part of a harmless error analysis is qualified by the exception for unlawfully obtained confessions, this is the first case in which we are called on to apply the exception, rather than the general rule.

■   The present case, in contrast to *McGinnis* and our cases cited above that follow *McGinnis*, does involve a constitutional violation that implicates the voluntariness of the erroneously admitted evidence—in fact, the constitutional violation is of the same type that the court discussed at length in *McGinnis* when the court adopted the general rule set forth in the United States Supreme Court's case law, as well as the exception to that general rule. In this case, the statements that defendant made while handcuffed in the

---

admission of illegally obtained confessions. *See State v. Sparks*, 228 Or App 163, 168 n 4, 206 P3d 1197 (2009) (noting that it is an open question whether the exception described in *McGinnis* might apply in some circumstances when the underlying evidence involves a violation of Article I, section 9, of the Oregon Constitution).

police car were made in "compelling circumstances," in violation of Article I, section 12, of the Oregon Constitution because defendant had not been given *Miranda* warnings. That is, in fact, exactly the limited circumstances to which the rule from *Harrison* applies. *McGinnis*, 335 Or at 253. Thus, under *McGinnis*, defendant's testimony at trial cannot be used to establish "harmless error" with regard to the illegally obtained evidence.

Reversed and remanded.