Argued and submitted July 21, 2009, reversed June 9, 2010

ALEXANDER D. HOLCOMB,
*Petitioner-Respondent,*

*v.*

Jean HILL,
Superintendent,
Snake River Correctional Institution,
*Defendant-Appellant.*

Malheur County Circuit Court
06024970M; A137190

233 P3d 448

Ryan Kahn, Assistant Attorney General, argued the cause for appellant. With him on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Rankin Johnson IV argued the cause and filed the brief for respondent. Alexander D. Holcomb filed the supplemental brief *pro se*.

Before Landau, Presiding Judge, and Brewer, Chief Judge, and Schuman, Judge.

BREWER, C. J.

**BREWER, C. J.**

Defendant Jean Hill, Superintendent of the Snake River Correctional Institution (hereinafter referred to as "the state"), appeals a judgment granting petitioner post-conviction relief and setting aside his convictions for first-degree rape, first-degree unlawful sexual penetration, first-degree sexual abuse, fourth-degree assault, and two counts of first-degree burglary. The state argues that the post-conviction court erroneously concluded that trial counsel's performance was constitutionally deficient in three respects and further erred in concluding that those deficiencies had a tendency to affect the result of the prosecution. As explained below, although we agree with the post-conviction court that trial counsel failed to exercise reasonable professional skill and judgment with respect to one of the three alleged deficiencies, we conclude that counsel exercised reasonable professional skill and judgment with respect to the other two. Furthermore, we conclude that the one way in which counsel provided inadequate assistance did not have a tendency to affect the result of the prosecution. Accordingly, we reverse.

In particular, the post-conviction court determined that petitioner's trial counsel's performance was inadequate in three respects: (1) counsel failed to challenge the admissibility of several recorded telephone calls between petitioner and the victim; (2) counsel failed to adequately litigate a suppression motion with respect to statements that petitioner made to police; and (3) counsel failed to adequately investigate and litigate an OEC 412 issue concerning whether evidence of the victim's subsequent sexual activity with another man should have been admitted. As explained below, we conclude that counsel did not provide inadequate assistance concerning the recorded telephone calls, because he properly concluded that they would not have been suppressed. Likewise, we conclude that the statements petitioner made to the police would not have been suppressed. Furthermore, although counsel's representation was deficient with respect to the OEC 412 issue, because petitioner was not prejudiced by counsel's deficiency, we conclude that the post-conviction court erred in granting petitioner post-conviction relief.

 We turn to the facts of the case. If evidence in the record supports the post-conviction court's findings of historical fact, they will not be disturbed by this court.

> "If findings are not made on all such facts, and there is evidence from which such facts could be decided more than one way, we will presume that the facts were decided in a manner consistent with the ultimate conclusion, *e.g.*, voluntariness or lack thereof, made by the trial court or jury. Whether these historical facts as found are sufficient to sustain a finding of voluntariness which meets state and federal constitutional concepts of due process is another question, and one which falls within our proper scope of appellate review."

*Ball v. Gladden*, 250 Or 485, 487, 443 P2d 621 (1968). With that standard in mind, we first describe the evidence adduced at trial in the underlying criminal proceeding, then the legal issues litigated in the criminal trial and on appeal and, finally, the evidence presented in this post-conviction proceeding.

The victim, L, testified in petitioner's criminal trial as follows: She met petitioner in early 2000 and became involved in a sexual relationship with him. Their consensual sexual relationship included role-playing, bondage, hair-pulling, and choking, with petitioner taking a dominant role and L taking a submissive role.

In April 2002, petitioner and L, along with L's infant son, moved into an apartment together. Several months later, petitioner and L terminated their relationship, petitioner moved out of the apartment, and Schurwon moved in with L. Petitioner was angry when he moved out but, by September 2002, petitioner and L had a better relationship. L, however, did not want to resume a sexual relationship with petitioner, although petitioner repeatedly told her he wanted to resume their sexual relationship.

On approximately October 28, 2002, L and Schurwon put on a "lingerie show" for petitioner and Schurwon's boyfriend, during which L did a lap dance for petitioner. L told petitioner that she would not have sex with him at that time. On October 30, 2002, petitioner visited L

and they watched movies together. L refused to sit close to petitioner. Petitioner left behind some papers.

The following morning, petitioner returned to L's apartment to pick up the papers. They talked and smoked cigarettes, and petitioner again indicated that he wanted to resume their relationship and wanted to have sex. L refused, and petitioner became angry. Petitioner pushed L to the couch, put his hand over her mouth and nose and punched her on the right side of her face. L urged petitioner not to do that in front of her son, then two years old. At that point, petitioner pulled L by her hair into the bedroom, told her to undress, then proceeded to rape and sexually abuse her. L repeatedly told him to stop. When petitioner finally stopped, he told L to tell him he was a "sick man," then said "I bet you never thought I would do something like this, did you?," after which he said "bye-bye bitch," and left the apartment. L testified that, after the incident, the right side of her face was swollen, she had a cut on the inside of her mouth, and her vagina hurt.

L's roommate, Schurwon, testified that later that day, she returned to the apartment, noticed L's eyes were red from crying, and noticed a slight swelling on one side of L's face. Schurwon asked what had happened, and L told Schurwon that petitioner had raped her.

After discussing the rape with several people, L decided to contact the police on November 2, 2002. L was taken to a hospital for a rape examination, where she was examined by a nurse who specialized in the treatment of sexual assault victims. The nurse observed a small abrasion, approximately one-half centimeter in width, on the inside of L's right cheek. The nurse opined that the abrasion was consistent with trauma caused by a fist, or by L's mouth being held shut to prevent her from breathing. The nurse testified that L's delay in reporting was not inconsistent with her having been sexually assaulted and that assault victims frequently do not disclose abuse immediately, due to fright and embarrassment. L did not report any pain besides jaw pain, and the physical examination did not reveal vaginal trauma.

L subsequently was interviewed by Detective Usery. Usery suggested that L make recorded telephone calls to

petitioner, trying to get him to talk about what had happened.

On November 8, 2002, L made her first recorded call to petitioner from the police station. During that call, she asked petitioner if he would apologize. Petitioner replied that what he did "was wrong." L said that petitioner hit her so hard that her jaw was swollen and that he did it in front of her child, to which petitioner replied, "I apologize. I was freaked out." L later said "You raped me!" to which petitioner replied, "So...yes. And, I'm a bad person for that." Petitioner apologized several times, and indicated that what he did was "wrong."

L next made two recorded phone calls from the police station on November 12, 2002. During one of the conversations, L said, "instead you decided, oh, I'll just rape her?" to which petitioner responded, "No...no. Yeah." Later, petitioner said it had been a "mistake," and L responded, "are you gonna force me to have sex with you again?" to which petitioner replied, "No!" L then asked, "Well, why did you do it the first time?" Petitioner answered, "Because I lost myself * * * lost control of myself and I don't want to...and I'm not going to do that again." Somewhat later, L said, "You sit here and admit it to me that you raped me." Petitioner responded, "Uh, yes that's...that is what happened. You did not want it, and I forced it on you, yes. That is what happened. And I regret it."

On November 14, petitioner returned to L's apartment and knocked on the door. L closed and locked the door, and petitioner knocked on the window. L told petitioner that she wasn't feeling well and didn't want to talk to him. Petitioner responded that he would knock on her door until she answered, at which point petitioner resumed pounding on the door. L then jumped off her balcony and called the police.

Usery heard L's call come in on the police radio and went to L's address. Several uniformed officers were already speaking to petitioner outside of L's apartment. Usery asked petitioner if he could talk to him, and petitioner agreed. Petitioner spontaneously began to tell Usery about his relationship with L. Usery told petitioner that L had made a complaint to the police about a sexual contact on the morning of

October 31 and that L had reported that she was uncomfortable with the amount of force he had used. Petitioner acknowledged that he had been at L's apartment on the morning of the October 31, but initially denied that there had been any sexual contact. Petitioner admitted that, on that occasion, L said that she felt threatened by him and asked him to leave. When Usery told petitioner that he believed that sexual contact had taken place, petitioner said that L had "come on to him," and admitted that they had engaged in "S & M," but that L had consented to whatever force was used. Petitioner denied hitting L in the face, but acknowledged that he had choked her and punched her in the ribs because, according to him, L liked pain.

Petitioner testified that his sexual relationship with L had involved physical force and that she had encouraged and consented to that force. He testified that she liked to be asphyxiated and to have her hair pulled during sexual activity. He testified that they broke up in August 2002, but that they started having regular contact again in October, when he went to her apartment almost every day. Petitioner told L that he loved her and wanted to be with her. He testified that, several days before October 31, L and Schurwon had done a "lingerie show" that involved L dancing and stripping for him but that when he tried to touch her, she would not let him. He said that after they watched a movie together on October 30, he talked about getting back together with her, but then got upset and left, telling her he wanted the relationship to end.

Petitioner said that he returned the following morning to pick up papers that he had left at L's apartment, told her that he wanted to be with her but that it was not going to work, and that he needed to move on. He testified that he started to leave, but she started hugging and kissing him. They went to the couch and engaged in sexual contact to which she consented. He asked her to remove her pants, but she said she did not want to do that in front of her son. They then went to the bedroom, where L took her clothes off and got on the bed. They engaged in consensual sexual intercourse, and the only point at which she had said "no" was when he tried to play with her vagina and when he asked her to play with her vagina. He testified that the sexual intercourse was "rough," and that he choked her "like she asked."

He indicated that, after the sexual encounter, they had a "huge argument" and that she told him that she felt threatened by him and asked him to leave, after which he left.

Petitioner testified that when he had the telephone conversation with L on November 8, he was apologizing for his role in their argument on the morning of October 31. He testified that, at various points during the November 12 telephone conversations, he admitted to raping L, but only because he wanted to get back together with her. He asserted that his apologies were for the argument that followed the consensual sexual encounter. Petitioner testified that, when he talked to Usery, he had initially denied having a sexual encounter with L on October 31, because rough sex "was not a normal thing," and that "[i]t seemed like I was raping her, so I was trying to deny it because I knew those aren't appropriate things." He testified that he did not like rough sex but that he agreed to it because it was what L wanted. Petitioner also presented testimony from two witnesses, his sister and a friend, that he had a reputation for truthfulness.

After the close of the evidence, the court found petitioner guilty on the various charges specified above, describing the evidence as "overwhelming."

We now recount the pertinent procedural events that occurred in the course of the criminal prosecution. Before trial, defense counsel filed an OEC 412 motion, seeking to admit evidence of the prior sexual relationship between petitioner and the victim and also seeking to admit evidence that the victim had had sexual intercourse with another individual, Katzman, one day after the rape. The state conceded that the evidence of petitioner's and the victim's prior relationship was admissible under OEC 412; concerning L's sexual activity following the rape, the parties debated the applicability of the rule of law announced in *State v. Beeler*, 166 Or App 275, 999 P2d 497, *rev den*, 331 Or 244 (2000) (evidence that a victim engaged in consensual intercourse one day after a rape was inadmissible). Defense counsel argued that the constitutional interests at stake were different from those in *Beeler*, given that L had volunteered information about the subsequent intercourse during the rape examination at the hospital and in conversations with

the investigating officer. The court excluded the evidence, but suggested that the issue could be revisited, depending on what evidence was adduced at trial.

The parties also litigated a *Miranda* issue before trial.[1] The state presented evidence from Usery concerning his interaction with defendant on November 14, 2002. Usery testified that he heard a radio dispatch concerning a possible trespass by petitioner at the victim's apartment and went to the scene with another detective. Uniformed officers were at the scene, and Usery asked one of them if he would be interrupting anything if he spoke with petitioner. The officer said no, that they were finishing up, and were about to leave. Usery understood that the officers had concluded that petitioner had not committed any crime there and that they did not intend to detain petitioner. Usery and the other detective approached petitioner, identified themselves, and asked if he would mind talking to Usery. Petitioner, who was seated on a stairway outside the apartment, said, "Okay." Usery asked petitioner if he would step over to a covered area by the stairway, because it was raining; petitioner agreed. They had a "low keyed" conversation that began with petitioner, who was "cooperative," spontaneously beginning to describe his relationship with the victim. Usery, who was in plain clothes, did not indicate that petitioner was under arrest or that he was not free to leave until the end of the conversation when petitioner was arrested. The prosecutor argued that petitioner was not in custody when he made statements to Usery; defense counsel offered no contrary argument, and the trial court ruled that there was no *Miranda* violation.

After petitioner was convicted, he appealed. His appellate counsel argued that the trial court had erred in ruling on petitioner's OEC 412 motion that the evidence concerning the victim's consensual sex with another person one day after the rape was inadmissible. Appellate counsel argued that *Beeler* was wrongly decided or, in the alternative, that it was distinguishable. In particular, appellate counsel

---

[1] The record in the post-conviction court is somewhat sparse concerning the context of this motion. It appears that the issue was discussed in chambers, that petitioner had submitted an affidavit concerning the *Miranda* issue, and that there had been an agreement and stipulation concerning the evidence. The record does not contain that affidavit or the stipulation.

argued that the evidence of consensual sex after the rape should have been admitted in light of L's assertion that her vagina hurt after the rape, describing it as "strong impeachment evidence." The state, as respondent, argued that petitioner had failed to preserve the argument that evidence of the subsequent sexual conduct was relevant to impeach the victim's statement that her vagina hurt after the rape. This court affirmed petitioners' convictions without opinion. *State v. Holcomb*, 202 Or App 327, 124 P3d 234 (2005).

After petitioner's convictions were affirmed on direct appeal, he brought this action for post-conviction relief, alleging that he had received inadequate assistance of trial counsel. Among other things, the evidence in the post-conviction proceeding included the record from the criminal proceeding as described above, as well as petitioner's deposition, the deposition of petitioner's trial counsel, the deposition of Katzman, with whom L had sex the day after the rape, and expert testimony from a criminal defense lawyer who opined that counsel's representation of petitioner was inadequate.

We first describe, in pertinent part, petitioner's deposition. Petitioner testified in his deposition that he told defense counsel, Butterfield, that Butterfield should contact Katzman to determine if Katzman had caused the cheek abrasion that was observed during L's rape examination at the hospital. Petitioner testified that he did not recall what Butterfield had said but that petitioner's "feeling" was that Butterfield did not think it was relevant.

Petitioner also testified that, when the uniformed police officers approached him outside L's apartment on November 14, they took his identification and ran a warrant check, and told him to remain there because detectives were on their way and wanted to talk to him. Petitioner believed that there were three to five uniformed officers present. After Usery and a second detective arrived, petitioner felt that he was not free to leave, although they did not tell him that he was not free to leave. Most of the uniformed officers left after Usery and the other detective arrived, although one uniformed officer remained near his police car some distance away.

Petitioner testified that Butterfield told him that the November 8 and 12 taped telephone conversations would be admitted into evidence against him and that there was no legal basis to exclude that evidence. Concerning those telephone calls and his admission, petitioner testified that "it came to me that she just wanted me to admit so we could get on with our relationship[.]" He stated:

"I felt that she was coming across, you know, in the conversations that we had after the incident that, you know, she would want me to admit to something and that if I admitted to that that nothing else would go wrong. That she would, you know, we would have a relationship and she would not press charges or anything and nothing else would come up about it. If I did what she asked me to do, then there would be, everything would be a clean slate after that."

(Underscoring omitted.) When asked, "Was it in the context of those calls that she was promising you that if you made admissions or agreed with her accusations that she would resume the relationship with you?" petitioner responded, "Correct."[2]

Petitioner's trial counsel, Butterfield, provided deposition testimony in support of petitioner's inadequate assistance claims. In general, Butterfield recalled little about petitioner's case and, in fact, did not even recall that the case had gone to trial. He recalled that he had recommended that petitioner should "strongly consider" entering into a plea agreement. He did not believe that there was a basis for arguing that the recorded conversations between petitioner and the victim should have been suppressed. He recalled that petitioner's explanation for his admissions during the recorded telephone calls "varied a little bit," but that in general, petitioner had indicated that he said what he did "to shut her up." Butterfield stated that petitioner's account of the telephone calls "just didn't ring true to me," and he believed that it would be difficult at trial for a factfinder to accept petitioner's explanation. Butterfield did not recall whether he had asked

---

[2] There is some evidence, both in the criminal trial transcript and in the postconviction record, that petitioner and L may have spoken to each other at some point between November 8 and November 12. Nothing in the record, however, reflects that petitioner asserted that L made any explicit promises to him during that unrecorded conversation that bear on the issues in this case.

his investigator to speak to Katzman, the person with whom the victim had sex after the rape, and he did not specifically recall what had been litigated in the OEC 412 motion. He did recall that there was an issue concerning the victim having sex after the rape and that he had tried to get that fact admitted into evidence. On cross-examination, Butterfield conceded that it would have been reasonable to offer evidence that the victim had sex with Katzman after the rape to rebut the evidence that petitioner caused the victim's physical injuries.

Katzman also provided an affidavit in support of petitioner's petition for post-conviction relief. He indicated that he had had a sexual relationship with the victim, that the victim was very aggressive, manipulative, and promiscuous, and that the victim liked to be choked and have her hair pulled during sex. He averred that, although he did not remember specific dates, he and the victim had met on several occasions around November 1, 2002, for the purpose of having sex. He further averred that, during those encounters, he did not see any injuries on the victim, and the victim did not complain of her vagina hurting or indicate that she had been raped.

Finally, petitioner presented expert testimony from a defense lawyer, Lewis, who opined that Butterfield had failed to adequately investigate the case, failed to argue and preserve issues concerning the victim's sexual conduct, and failed to properly litigate a motion to suppress petitioner's statements made during his conversation with Usery and during the telephone calls with the victim.

As noted, the post-conviction court agreed that petitioner's trial counsel performed deficiently in all those respects, and it implicitly concluded that petitioner had been prejudiced by counsel's deficiencies.

The state asserts on appeal that the post-conviction court erred in granting relief. To obtain post-conviction relief based on inadequate assistance of counsel under Article I, section 11, of the Oregon Constitution, a petitioner must demonstrate that trial counsel failed to exercise reasonable professional skill and judgment and that he or she suffered prejudice as a result. *Trujillo v. Maass*, 312 Or 431, 435,

822 P2d 703 (1991). Similarly, under the United States Constitution, a petitioner must prove that trial counsel's performance "fell below an objective standard of reasonableness * * * under prevailing professional norms" and that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington,* 466 US 668, 688, 694, 104 S Ct 2052, 80 L Ed 2d 674 (1984). To demonstrate prejudice, a petitioner must show that counsel's acts or omissions had a tendency to affect the result of the prosecution. *Stevens v. State of Oregon,* 322 Or 101, 110, 902 P2d 1137 (1995).

■ We first turn to the question of whether counsel's failure to challenge the admission of the recorded telephone calls between petitioner and the victim fell below an objective standard for reasonableness. Petitioner asserted, and the post-conviction court implicitly agreed, that counsel should have litigated—and litigated successfully—a motion to suppress those recordings on the ground that the victim, acting as an agent for the police, obtained the admissions contained in those recordings by making an implied promise, which rendered the admissions involuntary as a matter of law. *See State v. Goree,* 151 Or App 621, 631, 950 P2d 919 (1997), *rev den,* 327 Or 123 (1998) ("A confession or admission that was obtained by a promise of immunity or leniency on the same charge is involuntary as a matter of law." *Citing State v. Ely,* 237 Or 329, 334, 390 P2d 348 (1964).). Petitioner contends that the promise need not proffer immunity or leniency, but merely must have produced the admission. In particular, petitioner points to the statement in *Ely* that "the state has the burden of showing that [an admission] was voluntarily made, without the inducement of fear or hope." *Id.* at 332. Petitioner argues that, because there was evidence that he made the admissions in the hope of resuming a sexual relationship with the victim, the admissions were involuntary as a matter of law under *Ely* and its progeny.

■ The difficulty with petitioner's argument is that the case law does not support the premise that an admission made based on hope, in the absence of a promise of leniency or immunity, renders an admission involuntary as a matter of law. *See, e.g., State v. Hoehne,* 163 Or App 402, 407, 989 P2d 469 (1999), *rev den,* 330 Or 252 (2000) (incriminating

statements made in response to suggestion that probationer should become a police informant were not involuntary as a matter of law); *Goree*, 151 Or App at 632-33 (statements made in response to promise concerning leniency on one charge did not render statements concerning other crimes involuntary); *State v. Pollard*, 132 Or App 538, 548, 888 P2d 1054, *rev den*, 321 Or 138 (1995) (promise of treatment that induced confession was involuntary as a matter of law because promise implied that treatment was an alternative to taking the case before the grand jury). As the court stated in *State v. Smith*, 301 Or 681, 693, 725 P2d 894 (1986), "the key to the 'free and voluntary' character of the confession is in the inducement made to the defendant—was there any promise or threat made to the defendant which would elicit a false confession[.]" In this case, petitioner failed to establish that any threat or promise induced him to make the statements that he made to the victim during the recorded telephone calls.[3]

In sum, we conclude that petitioner's trial counsel correctly determined that a challenge to the admissibility of the taped telephone conversations on the basis that petitioner's admissions were involuntary as a matter of

---

[3] In a *pro se* supplemental response, petitioner asserts that the record shows a promise made, citing his deposition testimony:

"I felt that she was coming across, you know, in the conversations that we had after the incident that, you know, she would want me to admit to something and that if I admitted to that that nothing else would go wrong. That she would, you know, we would have a relationship and she would not press charges or anything * * *."

(Underscoring omitted.) The difficulty with petitioner's argument is that, when viewed in context, that statement does not support an inference that the victim made any promise. Petitioner was specifically asked, after he made the above-quoted statement, whether in the context of the recorded telephone calls, he felt she "was promising you that if you made admissions or agreed with her accusations that she would resume the relationship with you?" Petitioner responded, "Correct." As noted above, the transcript of the telephone calls reveals no such promise. Thus, that statement by petitioner simply reflects that he "felt" that she was "coming across" that way, not that any promise of leniency was actually made. A person's subjective feelings do not determine whether an admission or confession is involuntary as a matter of law; the test is whether a reasonable person would have understood a promise of leniency or immunity to have been made. *See State v. Aguilar*, 133 Or App 304, 307-08, 891 P2d 668 (1995) (if a person in the defendant's circumstances reasonably would have believed that a promise of immunity had been made, a confession is deemed to have been induced by the promise and is involuntary as a matter of law).

law would not have been successful. Accordingly, the post-conviction court erred in determining that counsel provided inadequate assistance in that regard.

■ We next consider whether the post-conviction court correctly concluded that counsel failed to adequately litigate a suppression motion with respect to statements that petitioner made to police. The essence of petitioner's claim is that, before questioning petitioner outside of the victim's apartment on November 14, Usery should have given him *Miranda* warnings because, although petitioner was not in custody, the circumstances were compelling.

■ Under Article I, section 12, of the Oregon Constitution, "[n]o person shall be * * * compelled in any criminal prosecution to testify against himself." Thus, police may not interrogate a person who is in custody or in compelling circumstances without first giving *Miranda* warnings. *See generally State v. Roble-Baker*, 340 Or 631, 638, 136 P3d 22 (2006). To determine whether circumstances are sufficiently compelling to require *Miranda* warnings, the court must examine the totality of the circumstances, in light of several factors: "(1) the location of the encounter, (2) the length of the encounter, (3) the amount of pressure exerted on the defendant, and (4) the defendant's ability to terminate the encounter." *State v. Moore*, 229 Or App 255, 259-60, 211 P3d 344 (2009), *rev allowed*, 348 Or 114 (2010) (citing *Roble-Baker*, 340 Or at 640-41). In *Roble-Baker*, the defendant voluntarily went to the police station to be interviewed concerning a murder. Although the defendant was told that she would be free to leave during an hour-long interview, she was dependent on the police to provide transportation; moreover, she had been told that her young son was being brought to the police station, that the police were fearful that she would hurt herself or her son, and that they should "end this nightmare now." The defendant then confessed. *Id.* at 634-35. The court concluded that the circumstances were compelling, noting that, "with greater persistence," the defendant might have been able to terminate the interview and secure transportation, but "[a]s a practical matter, defendant could not leave until her son arrived." *Id.* at 642.

Petitioner suggests that this case is analogous to *Roble-Baker*, asserting that he was "surrounded" by police officers "in the confines" of a stairwell and "accused of rape." The record, however, does not support petitioner's characterization of the encounter. The record contains photographs showing a stairway outside of the victim's apartment where the encounter occurred. As noted above, petitioner had been pounding on the door, and he was approached by several officers who had arrived on bicycles. Later, another officer or officers arrived in a police car. The officers investigated the disturbance where it occurred—outside the victim's apartment—called in petitioner's identification, were told that Usery wanted to talk to petitioner, and subsequently told petitioner to remain at the location until Usery arrived. The officers who originally investigated, having determined that no crime had been committed, did not cite petitioner or indicate in any way that he was in trouble. When Usery and another detective arrived approximately seven minutes after the encounter began, the original investigating officers were leaving. One of the investigating officers handed petitioner's identification to Usery, who returned it to petitioner. Usery said that he wanted to talk to petitioner, and petitioner agreed. Petitioner was not restrained in any way, nor was he told that he could not leave. The conversation with Usery lasted approximately 30 minutes. Neither petitioner's nor Usery's account of that conversation indicates that Usery said or did anything coercive. Although it is true that, throughout the conversation, Usery had probable cause to arrest petitioner, and at the end of the encounter he did arrest petitioner, that fact does not render the circumstances so compelling as to require the giving of *Miranda* warnings.

The facts of this case are more similar to those in *State v. Shaff*, 343 Or 639, 175 P3d 454 (2007), than to those in *Roble-Baker*. In *Shaff*, officers received a report from a delivery person that a woman who answered the door at the defendant's trailer appeared to be injured. Two officers went to the trailer, knocked, and received no response, although they could hear movement inside the trailer. While the officers were talking to a neighbor, the defendant opened the door to the trailer and looked out. The officers returned to the trailer and explained to the defendant that they needed to

make sure that the woman was safe. The officers entered the trailer and, while one officer searched for the woman, the other officer had the defendant take a seat on the couch, where they discussed "the incident." *Id.* at 641-42. The defendant acknowledged that he had argued with the woman. After about 10 minutes, the second officer took the woman outside to wait for a crisis counselor. The first officer told the defendant that the woman "obviously had been assaulted," and asked why she would have said she had been assaulted, after which the defendant admitted that he had hit the woman. At that point, the defendant was arrested and given *Miranda* warnings. *Id.* at 641-42.

In concluding that the defendant had not been in "compelling circumstances" before he was arrested and given *Miranda* warnings, the court reviewed the four factors from *Roble-Baker* described above. As for the location of the encounter, the court noted that it occurred in the defendant's own home, not a police station. "[T]he fact that the interview occurs in familiar surroundings diminishes the police-dominated atmosphere that *Miranda* warnings were intended to counteract." *Id.* at 646. Regarding the second factor, the length of the encounter, the court noted that the length, approximately 10 minutes, was no greater than a normal traffic stop. *Id.* at 646. As to the third factor, concerning the amount of pressure exerted on the defendant, the court observed that the officer who questioned the defendant had only talked twice about the assault during the 10-minute interview, in contrast to *Roble-Baker*, which involved detention of a suspect "after questioning her for five to six hours at the police station and continu[ing] to confront her about questions that assumed her guilt." *Id.* at 647, *citing Roble-Baker*, 340 Or at 643. The court concluded that, although the officer questioning the defendant "implied, inaccurately, that [the woman] had reported an assault," the circumstances were not sufficiently compelling to require *Miranda* warnings. *Shaff*, 343 Or at 647. In particular, the court distinguished between confronting a suspect with evidence of guilt, and the coercive use of such evidence: "[W]hat matters is not whether evidence of guilt was apparent to the suspect; rather, it is whether the officers used that evidence in a coercive manner." *Id.* at 650. Concerning the final factor, the

defendant's ability to terminate the encounter, the court observed that the defendant was not physically restrained "in the ordinary sense," although he was not free to terminate the encounter. *Id.* at 647-48.

We reiterate the facts of the present case as they relate to the four factors identified by the court in *Roble-Baker* and expanded upon in *Shaff*. First, the location of the encounter was near a stairway outside an apartment where petitioner had previously lived with the victim. That is, the surroundings were familiar (and petitioner had gone to the location willingly), and were not controlled by police officers, as a police station or a police car would be. Second, the duration of the encounter, approximately 30 minutes, was not excessive, particularly in light of the fact that officers had investigated the disturbance that petitioner had caused and then left without citing him. Third, there is no evidence that Usery used pressure on petitioner in a way that would be considered coercive—by all accounts, he kept the interview low-key, discussed the nature of the allegation against petitioner, and did not mislead him. As for the final factor, petitioner's ability to terminate the encounter, petitioner testified that he did not feel free to leave while Usery questioned him, and Usery testified that, in fact, he would not have permitted petitioner to leave.

The first three factors weigh strongly in favor of a conclusion that petitioner was not in compelling circumstances. The fourth factor is somewhat closer but we note, again, that petitioner was not physically restrained in any way, and his identification had been returned to him at the beginning of the encounter. In the totality of the circumstances, *Miranda* warnings were not required. The post-conviction court therefore erred in concluding that petitioner's trial counsel provided inadequate assistance in failing to obtain suppression of petitioner's statements.

■ Finally, we turn to the OEC 412 issue. As noted, petitioner asserted, and the post-conviction court agreed, that trial counsel's failure to adequately investigate and litigate the admissibility of the victim's sexual contact with Katzman after the rape was a deficiency of constitutional magnitude. As noted above, Butterfield did offer evidence of the victim's

sexual contact with Katzman. He addressed this court's decision in *Beeler*, and he attempted to distinguish *Beeler* on the ground that the victim here had little interest in the privacy of the information concerning the sexual contact because she had revealed it to the examiner in the course of the hospital examination. Before turning to petitioner's specific argument about how the issue should have been litigated, we briefly summarize *Beeler*.

In *Beeler*, the defendant offered evidence that a rape victim had had consensual sex with a former boyfriend one day after the rape, as well as testimony from an expert that a rape victim normally would be unable to have consensual sexual activity "for quite some time, if ever," after being raped. 166 Or App at 278-79. Because OEC 412 did not authorize the introduction of the evidence, the parties debated whether, despite OEC 412, the evidence nonetheless was constitutionally required to be admitted. In deciding that question, the court balanced the defendant's constitutional right to present evidence against the state's right to exclude evidence of limited relevance that would degrade and embarrass rape victims and discourage them from reporting crimes. *Id.* at 282-83. The defense theory in *Beeler* was that, because the victim had engaged in consensual sex the day after the rape, it was more likely that she also had consented to sex with the defendant. The court concluded that the relevance of the evidence was "marginal at best because there are any number of reasons why the complainant might have engaged in subsequent sexual relations." *Id.* at 285.

We also briefly describe the relevant portions of OEC 412. OEC 412(1) precludes reputation or opinion evidence concerning the past sexual behavior of a victim. OEC 412(2) precludes other evidence concerning the past sexual behavior of a victim, unless its admission is constitutionally required or it "[i]s necessary to rebut or explain scientific or medical evidence offered by the state[.]" OEC 412(2)(b)(B). There was no argument in *Beeler* that OEC 412(2)(b)(B) applied. In the present case, to the extent that petitioner contends that Butterfield provided inadequate assistance because he failed to interview (or have an investigator interview) Katzman, we agree. Given the sequence of events, Butterfield should have considered whether evidence concerning the victim's sexual

encounter with Katzman was admissible to rebut the evidence from the hospital examination conducted two days after the rape and one day after her sexual encounter with Katzman.

In the underlying criminal proceeding, the victim testified that she suffered a minor injury to her cheek during the rape, and her roommate noticed a slight swelling in the victim's cheek shortly after the rape. The hospital examination two days later revealed a tiny abrasion on the inside of one of the victim's cheeks that was consistent with the type of injury that she described having suffered during the rape. Butterfield possessed documents from the hospital examination that indicated that the victim had had sex with Katzman after the rape, and also included information supporting the victim's story that there had been an injury to her cheek. Butterfield did not, however, arrange to interview Katzman in order to determine whether Katzman could have been the source of the victim's cheek injury. Had he done so, he could have explored the possibility that evidence of the sexual encounter with Katzman fit within OEC 412(2)(b)(B). We can envision no reason why competent defense counsel would not seek to adduce evidence supporting an alternative explanation of how the victim received an injury allegedly sustained in the course of a rape. In sum, counsel's failure to pursue evidence concerning the victim's sexual encounter with Katzman constituted inadequate assistance of counsel.

The difficulty, however, is that petitioner has not demonstrated that he was prejudiced by counsel's omission. The Katzman evidence did *not*, in fact, disclose that Katzman was the source of the victim's injury. As revealed in his affidavit submitted in the post-conviction proceeding, Katzman wished to provide negative opinion and reputation evidence about the victim's manipulative and promiscuous nature. Katzman wished to testify that the victim liked rough sex. Finally, Katzman wished to testify that on none of the occasions he met with her for sex did she "look[ ] like she had been hit in the face or complain of her vagina hurting[.]" None of that evidence would have been admissible under OEC 412(2)(b)(B), to explain or rebut the medical evidence that the victim had a very small abrasion on the inside of her cheek two days after the rape.

Petitioner remonstrates that Katzman's testimony that the victim did not look like she had been hit in the face and that she did not complain of vaginal pain nonetheless would have been admissible. Petitioner asserts, first, that the evidence was constitutionally required to be admitted "to show that [L] lacked injuries consistent with her version of events." We disagree that the challenged evidence would have shown that the victim lacked injuries consistent with her version of events. The victim testified that, as a result of the rape, she had a swollen cheek, a cut inside her mouth, and her vagina hurt. Her roommate testified that, several hours after the rape, she noticed a slight swelling of the victim's cheek. The roommate testified, however, that the swelling was barely noticeable. The evidence from the hospital examination did not indicate that the victim was, at that point, complaining of vaginal pain, no vaginal trauma was discovered, and the only discernible injury was a small abrasion on the inside of the victim's cheek. In short, nothing in the record indicated that someone coming into contact with the victim the day after the rape and the day before the hospital examination would have noticed any injuries to the victim. Nor did petitioner adduce evidence that a person who suffers vaginal pain during a rape would suffer vaginal pain during subsequent consensual sexual encounters.

Petitioner's second argument is that evidence of the sexual encounter with Katzman was relevant, because it is "unlikely" that she would have had consensual sex with anyone the day after being raped. Petitioner acknowledges that that argument was squarely rejected by the court in *Beeler*, but he argues that *Beeler* was wrongly decided. Petitioner, however, does not explain how trial counsel's failure to make an argument that would have been unsuccessful under then-existing case law constituted inadequate assistance of counsel, much less how trial counsel's failure to make that argument could have prejudiced him.

In sum, we agree with the post-conviction court that trial counsel provided inadequate assistance by failing to locate and interview Katzman, in order to gain more evidence concerning the circumstances of the victim's sexual encounter with him the day after the rape. That omission, however, did not prejudice petitioner, because an interview with

Katzman would not have produced any admissible evidence that would have advanced petitioner's theory of the case.

We conclude that the post-conviction court erred in granting petitioner post-conviction relief.

Reversed.